UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:19-CR-0038-MMD-CLB |
| Plaintiff, | **ORDER** |
| v. | |
| EDWARD MONET KNIGHT, | |
| Defendant(s). | |

Before the court is Defendant Edward Monet Knight's ("Knight") Emergency Motion to Reopen Detention Hearing Due to the COVID-19 Pandemic. (ECF No. 30.) On July 19, 2019, Magistrate Judge George Foley, Jr. ordered Knight detained pending trial. (ECF No. 9.) Knight now seeks temporary release pursuant to 18 U.S.C. § 3142(i) for what he contends are compelling reasons related to the recent COVID-19 global pandemic. (ECF No. 30.) The Government opposed the motion, (ECF No. 35), and Knight replied. (ECF No. 37.) The court has thoroughly reviewed the filings, and for the reasons stated below, the court denies Knight's motion. (ECF No. 30.)

I.    **BACKGROUND AND PROCEDURAL HISTORY**

On July 12, 2019, Knight was charged in a two-count complaint with Interference with Commerce by Robbery and Use of a Firearm During and in Relation to a Crime of Violence. (ECF No. 2.) Knight fled to Las Vegas and was arrested on July 16, 2019, having his initial appearance before Magistrate Judge Foley on July 18, 2019. (ECF No. 4.) On July 19, 2019, Knight appeared for a detention hearing before Magistrate Judge Foley. (ECF No. 9.) On August 1, 2019, a federal grand jury indicted Knight in a four-count indictment, including two counts of Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, and two counts of Use of a Firearm During and in Relation

to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (ECF Nos. 14, 16.) Subsequently, Knight was transferred from Las Vegas to Reno, where he appeared before the court for arraignment and plea. (ECF No. 17.) Knight is currently housed at the Washoe County Detention Facility ("WCDF"), operated by the Washoe County Sheriff's Office ("WCSO"), in Reno, Nevada. (ECF No. 30.) Knight seeks an order for temporary release from custody for what he contends are compelling reasons—namely that the health risk to Knight is a compelling reason to grant release, and that temporary release is necessary to prepare his defense. (*Id.*) Defendant notes that correctional settings "offer no escape and little to no space for social distancing or other similar recommendations" made by experts to combat COVID-19. (*Id.* at 3.)

On March 11, 2020, the World Health Organization ("WHO") officially classified COVID-19, a disease caused by a new strain of coronavirus, as a pandemic.[1] According to the Centers for Disease Control ("CDC"), at the time this Order was written, there were 304,826 total cases of COVID-19 in the United States, and 7,616 deaths.[2] As of April 6, 2020, there were 1,953 positive cases of COVID-19 and 46 deaths in the State of Nevada[3], with only 231 active cases and 4 deaths in Washoe County (as of April 5, 2020)[4]. The actual number of people infected by the virus is likely much larger, given the current capacity for testing, and the rate at which COVID-19 is spreading and affecting communities around the world is alarming.[5]

[1]    *See* WHO, WHO DIRECTOR-GENERAL'S OPENING REMARKS AT THE MEDIA BRIEFING ON COVID-19, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020, (last visited Mar. 31, 2020).

[2]    *See* CDC, U.S. AT A GLANCE, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, (last viewed Apr. 6, 2020).

[3]    *See* Nev. Dept. of Health & Human Svcs., COVID-19, https://nvhealthresponse.nv.gov/, (last viewed Apr. 6, 2020).

[4]    *See* Regional Information Center, WASHOE COUNTY COVID-19 DASHBOARD, https://gis.washoecounty.us/COVID19 (last viewed Apr. 6, 2020).

[5]    *See* New York Times, CORONAVIRUS IN THE U.S.: LATEST MAP AND CASE COUNT, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html, (last viewed Apr. 2, 2020).

The CDC identifies certain categories of individuals at a higher risk of severe illness, including older adults (65 and older) and people of any age who have serious underlying medical conditions as a higher risk for severe illness from COVID-19.[6] The following conditions could make a person higher risk: people with chronic lung disease or moderate-to-severe asthma, people with serious heart conditions, people who are immunocompromised, including cancer treatment, people of any age with severe obesity or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, chronic kidney disease undergoing dialysis, or liver disease. *Id.*

Nevada Governor Steve Sisolak declared a State of Emergency on March 12, 2020.[7] Schools, government agencies, casinos and nonessential businesses have closed and will continue to be closed at least through the end of April.[8] Governor Sisolak, on April 1, 2020, issued a directive for Nevada residents to stay at home. *Id.*

The District of Nevada has also taken measures to protect the public, staff, and litigants from the risks of COVID-19. *See* Temporary General Orders 2020-02, 2020-03, 2020-04, 2020-05. While no cases of WCDF inmates being infected have been reported, it is likely only a matter of time before that occurs. As of April 3, 2020, three WCSO employees have tested positive for the virus, two deputies and one civilian employee.[9] WCSO immediately began working in coordination with the Washoe County Health

---

[6] *See* CDC, PEOPLE WHO ARE AT HIGHER RISK FOR SEVERE ILLNESS, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html, (last viewed Apr. 2, 2020).

[7] Associated Press, VIRUS PROMPTS NEV. GOVERNOR EMERGENCY ORDER, CANCELLATIONS (Mar. 13, 2020), https://knpr.org/headline/2020-03/virus-prompts-nev-governor-emergency-order-cancellations, (last viewed Apr. 2, 2020).

[8] *See* Nevada Independent, SISOLAK EXTENDS COVID-19 SHUTDOWN UNTIL END OF APRIL, URGES RESIDENTS TO SHELTER-IN-PLACE, https://thenevadaindependent.com/article/sisolak-extends-covid-19-shutdown-until-end-of-april-urges-residents-to-shelter-in-place, (last viewed Apr. 3, 2020).

[9] *See* Regional Information Center, UPDATE FOR MARCH 28, https://www.washoecounty.us/outreach/2020/03/2020-03-28-jic-0328-update.php, (last viewed Apr. 3, 2020); UPDATE FOR APRIL 2, https://covid19washoe.com/press-release/regional-information-center-update-for-april-2/, (last viewed Apr. 3, 2020).

Department to implement recommended measures, such as single point entry and screening for all employees and visitors. *Id.* All those needing to enter WCSO for business will have their temperature taken and answer basic screening questions before admittance. *Id.* Additionally, WCSO began instituting additional precautions such as increased medical screenings for arrestees, increased education and awareness for both inmates and staff, and increased sanitation efforts throughout the entire WCSO. *Id.* There is no doubt the danger posed by the virus is real, with entire economies and some healthcare systems around the world collapsing or on the verge of collapsing as the world attempts to contain the virus spread.

## II.    LEGAL STANDARDS

"A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He had only a judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Bell v. Wolfish,* 441 U.S. 520, 536-37 (1979) (internal quotations omitted). The government may detain someone on a federal offense to ensure his presence at trial and may subject him to the restrictions and conditions of detention so long as those conditions do not constitute punishment or otherwise amount to a constitutional violation. *Id.*

The Bail Reform Act ("BRA") of 1984 mandates every person charged with a federal offense be given a detention hearing. 18 U.S.C. § 3142(a). The fundamental precept of the BRA mandates the release of individuals so long as the court can reasonably be assured the defendant does not pose a flight risk or danger to the community. 18 U.S.C. § 3142. To the extent that conditions, or a combination of conditions, can be fashioned to reasonably provide for such assurances, the individual must be released, as detention is "the carefully crafted limited exception." *Id.; see also United States v. Salerno,* 481 U.S. 739, 755 (1989). If the judge finds the defendant poses a danger to public safety or a flight risk, the defendant may be ordered detained. 18 U.S.C. § 3142(f).

## A.    Section 3142(f) Reopening of Detention Hearing

Section 3142(f)(2) permits a judicial officer to reopen a detention hearing at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the detention hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.  Two of the detention release factors (among others) to be considered by the judicial officer are (1) the person's "physical and mental condition" (§ 3145(g)(3)(A)), and, (2) the nature and seriousness of the danger to any person or the community that would be posed by the person's release (§ 3145(g)(4)).

Courts interpret this provision strictly. *United States v. Bararia,* No. 2:12-cr-00236-MMD-GWF, 2013 WL 1907782, at *4 (D. Nev. Mar. 12, 2013); *e.g., United States v. Ward,* 63 F.Supp.2d 1203, 1206-07 (C.D. Cal. 1999); *United States v. Dillon,* 938 F.2d 1412, 1415 (1st Cir. 1991).  The rule requires the movant, whether prosecutor or defendant, establish: (1) that information now exists that was not known to the movant at the initial detention hearing, and (2) the new information is material to release conditions regarding flight or dangerousness. *Id.*; *see also United States v. Bowens,* 2007 WL 2220501 (D. Ariz. Jul. 31, 2007) (citing *United States v. Hare,* 873 F.2d 796 (5th Cir. 1989).  Generally, once a detention hearing is reopened, it is reopened to allow the court to receive any information, within reason, not submitted at the initial hearing, allowing the new information to be considered in context. *Id.*  If the information was available at the time of the original hearing, the detention hearing need not be reopened. *United States v. Turino,* 2014 WL 5261292, at *1 (D. Nev. Oct. 15, 2014) (citing *Ward,* 63 F.Supp.2d at 1206).

Courts may consider the defendant's physical ailments as a mitigating factor regarding the danger the defendant poses to society. *United States v. Adams,* 2019 WL 3037042, at *2 (D. Ore. Jul. 10, 2019).  Once the defendant provides evidence regarding his or her physical health that mitigates dangerousness, the government must show

- 5 -

through clear and convincing evidence the defendant still poses a danger to society. *Id.*; 18 U.S.C. § 3142(f)(2)(B). Release for a presumptively dangerous defendant is appropriate only when the defendant produces evidence of an extraordinary, life-threatening medical condition the jail or prison facility cannot treat and further shows the safety of the community may be reasonably assured through the conditions of release. *Id.*

Other district courts have considered COVID-19 concerns in the context of the more commonly used § 3142(f) pretrial detention framework, including the related subsections § 3142(e)(2)-(3) (statutory rebuttable presumptions) and § 3142(g) (Bail Reform Act factors). For example, the district court in *United States v. Martin,* considered the defendant's argument concerning his medical conditions (asthma, high blood pressure, and diabetes) considering the COVID-19 pandemic in a § 3142(f) analysis, holding that resolving an appeal of a detention order must be done as an individualized assessment of the Bail Reform factors. 2020 WL 1274857, at *3-4 (finding that defendant's confirmed medical conditions alone are insufficient to rebut the Government's proffer that correctional and medical staff are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus). Likewise, the district court in *United States v. Stephens,* considered speculative COVID-19 concerns in the context of a motion to reopen detention based on a change of circumstances. 2020 WL 1295155, at *2 (S.D.N.Y. 2020) (finding that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)"). However, the court did not reopen detention based solely on COVID-19 concerns but instead relied on new information weakening the Government's case against the defendant, undermining the court's prior finding as to whether the defendant posed a danger to the community. *Id.* at *1.

///

///

**B.** **Section 3142(i) Temporary Release of Person For Compelling Reason**

Section 3142(i) provides, in relevant part:

> "[t]he judicial officer may by subsequent order, permit the temporary release of the person, in the custody of a U.S. Marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary* for the preparation of the person's defense or *for another compelling reason.*"

§ 3142(i) (emphasis added). A defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i). *United States v. Clark,* 2020 WL 1446895, at *2 (D. Kan. Mar. 25, 2020); *see also United States v. Buswell,* 2013 WL 210899, at *5 (W.D. La. Jan. 18, 2013) (collecting cases). (stating that courts consider three factors related to trial preparation when considering whether pretrial release is "necessary" under § 3142(i).).

Most courts addressing a motion for temporary release under § 3142(i) have done so in the context of evaluating the necessity of the defendant assisting with preparing his or her defense. *Clark,* 2020 WL 1446895, at *2; *see, e.g., United States v. Cecerle,* 2014 WL 31674, at *4 (D. Nev. Jan. 3, 2014); *Buswell,* 2013 WL 210899, at *5; *United States v. Dupree,* 833 F.Supp. 2d 241, 247 (E.D. N.Y. 2011); *United States v. Jeffries,* 2011 WL 182867, at *4 (E.D. Tenn. Jan. 20, 2011); *United States v. Hazelwood,* 2011 WL 680178, at *3 (N.D. Ohio Feb. 16, 2011). Courts considering whether pretrial release is "necessary under § 3142(i) have considered: (1) time and opportunity the defendant has to prepare for the trial and to participate in his defense; (2) the complexity of the case and volume of information; and, (3) expense and inconvenience associated with preparing while incarcerated. *Cecerle,* 2014 WL 31674, at *4. This extends to the current COVID-19 pandemic inasmuch as at least one court has considered the pandemic's impact on counsel's difficulties communicating with the defendant. *See, e.g., Stephens,* 2020 WL 1295155, at *2.

Limited authority exists as to when temporary release is justified under § 3142(i) based on "another compelling reason," although a defendant's medical condition may

present that compelling reason in a particular case. *See United States v. Rebollo-Andino,* 312 Fed. App'x 346, 348 (1st Cir. 2009) (noting the defendant could seek temporary release under § 3142 for medical reasons).  Courts typically grant relief under § 3142(i) only "sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton,* 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *see e.g., United States v. Scarpa,* 815 F.Supp. 88 (E.D.N.Y. 1993) (permitting the defendant's release under the 24-hour guard of the U.S. Marshal Service at his own expense because of traumatic gunshot injury and terminal AIDS diagnosis and correctional authorities could no longer manage his medical conditions); *United States v. Cordero Caraballo,* 185 F.Supp. 2d 143, 144-47 (D.P.R. 2002) (ordering release of defendant who sustained multiple gunshot wounds, was partially paralyzed, could not walk, lost some arm function, who required the supervision of 4-5 contracted security guards on a daily basis and Bureau of Prisons could not provide required medical care).

Admittedly, courts have not previously faced the unique set of circumstances presently confronting the world as a result of COVID-19.  In light of the recent COVID-19 pandemic, courts across the country have addressed, and will continue to address requests for release under § 3142(i) in the context of the pandemic, considering both the impact of the pandemic on the ability to prepare a defense, and whether the health risks posed by the pandemic constitute a compelling reason for temporary release. *See e.g., United States v. Cox,* 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Tang,* 2:20-cr-0054-KJD-DJA, ECF No. 44 (D. Nev. Mar. 23, 2020) (reopening detention but denying temporary release under 3142(i)); *United States v. Motley,* 3:19-cr-00026-LRH-WGC, ECF No. 142 (D. Nev. Apr. 2, 2020); *United States v. Smoot*, 2020 WL 1501810 (S.D. Ohio Mar. 30, 2020); *United States v. Loveings,* 2020 WL 1501859 (W.D. Penn. Mar. 30, 2020); *United States v. Bastianelli,* 2020 WL 1493559 (W.D. Penn. Mar. 27, 2020) (citing other cases in the district); *United States v. Snowden,* 2020 WL 1492684

(S.D. Ill. Mar. 27, 2020); *United States v. Michaels,* 2020 WL 1482553 (C.D. Cal. Mar. 26, 2020); *United States v. Green,* 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020). Courts are also faced with requests for release in the context of civilly detained immigrants and convicted defendants. The court need not address those circumstances here.

## III. DISCUSSION

### A. Section 3142(f) Analysis

Knight argues in his reply brief he is moving for release under both §§ 3142(f) and (i); however, the opening motion does not make that clear. Instead, the motion itself contains a paragraph generally stating that the COVID-19 pandemic is a changed circumstance and then focuses mainly on § 3142(i). (ECF No. 37.) Knight argues the circumstances existing when he was ordered detained have now changed because the COVID-19 pandemic "poses a direct risk that is far greater" than if Knight "continues to be detained during this public health crisis." (ECF NO. 30 at 16.) Even though it is not explicitly stated, the court will address Knight's assertion that the risk of contracting COVID-19 at WCDF constitutes a changed circumstance requiring the reopening of his detention hearing under § 3142(f).

Government's opposition argues Knight has cited no valid basis because there is neither an outbreak of COVID-19 at WCDF nor any indication that Knight is particularly vulnerable to the illness compared to the general law-abiding population in the community or others in his own community at WCDF. (ECF No. 35.) Specifically, the Government argues Knight's concerns are speculative and generic about the potential contraction of COVID-19 at WCDF and there is no change of circumstances sufficient to undermine the court's conclusion that it cannot fashion a set of conditions to ensure Knight will not flee these proceedings. (*Id.* at 6.)

A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is

not a risk of nonappearance or a risk of harm to any others or the community. *Clark,* 2020 WL 1446895, at *3. The risk of harm to the defendant does not usually bear on this analysis; rather, whether a defendant's particular circumstances warrant release in light of the COVID-19 pandemic is more properly considered on a case-by-case basis under the "another compelling reason" prong of § 3142(i). *Id.*; *see e.g., United States v. Hamilton,* 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (denying temporary release based on the COVID-19 pandemic where the defendant was of advanced age and suffered from several significant health issues, with no reported incidents of COVID-19 within the facility where defendant was housed, and the Bureau of Prisons is taking "system-wide precautions" to mitigate the possibility of infection). Knight presents generalized concerns about the risk of contracting COVID-19 at WCDF, but never cites to any evidence serving to ameliorate concerns Knight is a flight risk and danger to the community to justify reopening detention under § 3142(f). Therefore, the court finds Knight's concerns relating to the COVID-19 virus are more properly addressed under § 3142(i) "compelling reason" analysis.

### B.   Section 3142(i) Analysis

Knight argues the health risk posed to him by the current COVID-19 pandemic is a compelling reason to temporarily release him. (ECF No. 30 at 3.) Specifically, Knight notes the conditions of pretrial confinement create an ideal environment for the spread of contagious diseases, with limited intake screening procedures, limited access to personal hygiene items, and limited medical services. (*Id.* at 7.) Knight also argues that WCDF's pandemic policy adjustments have led to limited communication with family and impaired his ability to prepare his defense. (*Id.* at 11-12.)

Knight argues that incarcerated individuals are at special risk of infection given their living situation, citing confirmed outbreaks of the virus at prisons in China and Iran, (*id.* at 8-9), federal Bureau of Prisons facilities, and within the Nevada Department of Corrections. (ECF No. 37 at 11-12). Knight notes steps being taken in some United

States prisons to release elderly and sick prisoners, as well as the temporary release of some pretrial detainees and civil immigration detainees. (*Id.* at 9-11.)  Knight contends current screening guidelines do not go far enough because jails are visited by lawyers, parole and probation officers, volunteers and others daily, which increases the potential for potential spread of the virus. (ECF No. 30 at 10.)  Knight asserts COVID-19 testing is hard to come by and WCDF's housing situation, which places inmates in small cells with beds close to one another, prevents detainees from engaging in CDC-recommended social distancing and self-quarantine. (*Id.* at 11-12.)  Knight cites the sharing of limited toilets, sinks and showers, movement restrictions, and limited access to personal hygiene items as precluding detainees from taking recommended precautions. (*Id.* at 11.)  Knight, if released, can reside with his significant other, Cristin Smith, as a third-party custodian. (*Id.* at 17.)  He is amenable to home confinement and location monitoring as conditions of release, along with any further condition the court deems appropriate. (*Id.*)

The Government disagrees with Knight, arguing no compelling reason exists for his temporary release. (ECF No. 35 at 2.)  The Government notes Knights cited no valid basis for release because there is neither a COVID-19 outbreak at WCDF nor any indication that Knight is particularly vulnerable to the illness compared to the general law-abiding population in the community or others in his own current community at the WCDF. (*Id.*)  The Government asserts the essence of Knight's argument relies on the mere possibility he will become infected with COVID-19 by someone else at the facility, but Knight has not demonstrated that his risk of contracting COVID-19 while in custody is significantly higher than if he were to be released nor has Knight shown he is at high risk to become severely ill in the event he does contract the virus. (*Id.* at 6.)  The Government argues Knight also failed to demonstrate that WCDF is unequipped to provide appropriate medical treatment if he were to become sick. (*Id.*)

The Government notes CDC guidelines provide that older adults (65 years and older) are at higher risk for severe infections, but Knight is only 31 years old[10], over three decades younger than the identified CDC group.  The Government also points out Knight does not argue he has any specific, high-risk underlying health conditions that put him at an increased risk for severe illness, and provides no medical documentation for the court to assess the manner in which COVID-19 could impact his health. (*Id.* at 7.)  In fact, during Knight's Pretrial Services interview, he indicated good health, that he was not under a doctor's care, was taking no medications, and had no history of medical problems. (*Id.* at 12.)  Finally, the Government argues to the extent Knight is at an increased risk of contracting the virus while detained, so are all other detainees. (*Id.* at 8.)  The Government asserts that if this increased risk is the compelling reason justifying release, then all detainees need to be released. (*Id.*)

Knight's reply reiterates his argument that WCDF is not adequately equipped to manage COVID-19, and the public health crisis stemming from the pandemic is a compelling reason for temporary release or a changing circumstance warranting reopening of detention. (ECF No. 37 at 1.)  Finally, Knight reasserts his argument that release is necessary for preparation of his defense because of COVID-19. (*Id.* at 14-15.)

The court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents, particularly within the jail and prison setting.  The CDC notes that "[c]orrectional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting.  The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and

---

[10]    WCSO, INMATE SEARCH, https://www.washoesheriff.com/inmate-search.php?key=FZ3Gyr208LcA71Ga25gsUQYYs, (last viewed Apr. 6, 2020).

visitors."[11]  The CDC cautions "once community transmission is identified in a particular area," as it has been in Washoe County, "correctional facilities and detention centers are more likely to start seeing cases inside their walls." *Id.*  The CDC provided interim guidance for steps correctional and detention facilities should take in preparation, prevention and management to help reduce the risk of transmission and severe illness from COVID-19. *Id.*  The CDC recommends facilities establish policies, procedures and protocols related to: operational and communications preparation; enhanced cleaning, disinfecting and hygiene practices; social distancing strategies to increase space between individuals in the facility; limiting transmission from visitors; infection control, including recommended personal protective equipment and alternatives if a shortage occurs; screening for incoming incarcerated or detained individuals, staff and visitors; medical isolation for confirmed and suspected cases and quarantine of contacts; healthcare evaluation for suspected cases, including testing measures; clinical care for confirmed and suspected cases; and considerations for persons at higher risk of severe infection. *Id.*

Nevertheless, in this context, a defendant should not be entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and speculation. *Clark,* 2020 WL 1446895, at *3.  Instead, the court must make an individualized determination as to whether COVID-19 concerns present such a compelling reason in a particular case that temporary release is necessary. *Id.*  The court will evaluate the four following factors: (1) the original grounds for the defendant's pretrial detention; (2) the specificity of the defendant's stated COVID-19 concerns; (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant; and (4) the likelihood that the defendant's proposed release would increase

---

[11]    *See* CDC, INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, (last viewed Apr. 3, 2020).

COVID-19 risks to others. *Id.* The court will not necessarily weigh these factors equally but will consider them in their entirety to determine whether a "compelling reason" exists such that temporary release is necessary. *Id.*; § 3142(i).

### 1. *The Original Grounds for the Defendant's Pretrial Detention*

The court first considers the original grounds for the defendant's pretrial detention. *Id.*; *see also Hamilton,* 2020 WL 1323036, at *1-2 (first considering the rebuttable presumption under § 3142(e) before considering whether the COVID-19 pandemic warranted temporary release under § 3142(i)); *Bararia,* 2013 WL 1907782, at *1-2 (considering the circumstances leading to the defendant's revocation of pretrial release); *Buswell,* 2013 WL 210899, at *5 (observing that "the facts surrounding the underlying reasons for the defendant's detention are relevant to the [§ 3142(i) ] analysis").

A defending seeking temporary release under § 3142(i) has already been determined by a court that pretrial detention was warranted on the grounds that no condition or combination of conditions would reasonably assure defendant is not a flight risk and/or not pose a risk of harm to others. *Clark,* 2020 WL at 1446895, at *3. Accordingly, the court takes into consideration whether the defendant has presented such compelling reasons that effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order. *Id.*

Here, Magistrate Judge Foley ordered Knight detained pending trial based on a finding that Knight had not introduced sufficient evidence to rebut the presumption of detention. (ECF No. 12.) After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, Judge Foley concluded Knight posed a risk of nonappearance and danger to the community based on the allegations set forth in the complaint, the Government's proffer, and information provided to the court by Pretrial Services. (*Id.* at 3.) Specifically, the court found Knight's criminal history record indicated prior felony convictions for robbery as well as felony attempted burglary charges, noting Knight was convicted of felony robbery in August 2014, and sentenced

to 48 to 120 months in prison. (*Id.*)  Knight was released from prison on May 24, 2019, and the alleged offense occurred on July 8, 2019. (*Id.*)  The vehicle operated by Knight fled from the robbery scene, pursued by officers, who were unable to apprehend Knight. (*Id.*)  The court found Knight had family ties in Reno but had very few financial resources due to his incarceration. (*Id.*)

While Knight claims he is amenable to home confinement and location monitoring, he does not present any evidence to override or counterbalance the original determination that conditions, including the conditions he presently proposes, would not reasonably assure his appearance at trial.  In particular, Knight's criminal history is concerning. Knight was released from prison on similar charges on May 24, 2019 and committed two alleged robberies beginning on July 7, 2019—less than two months after his release.  The grand jury found probable cause to believe he engaged in not one, but two, additional robberies using a deadly weapon.  The use of a firearm charge during and in relation to a crime of violence charges create a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(1) and (e)(3)(B).  Knight provides no new information to overcome the rebuttable presumption for detention, and in fact, has already demonstrated unwillingness to comply with community standards through his criminal history and the actions giving rise to this case.  Therefore, Knight has not presented any evidence to alleviate the court's concerns that he remains a flight risk and that there are no conditions that could be fashioned to reasonably assure his appearance at trial.  Thus, this factor weighs against Knight's temporary release.

### 2. *The Specificity of the Defendant's Stated COVID-19 Concerns*

The court turns next to the defendant's stated COVID-19 concerns. *Clark,* 2020 WL at 1446895, at *4.  Knight raises only generalized concerns regarding the impact COVID-19 may have on him if he continues to be detained during this pandemic.  Knight asserts generalizations regarding prisons and detention facilities being at higher risk for an outbreak and presents conclusory assertions that the WCDF and WCSO are not

adequately prepared to prevent an outbreak, and unprepared to manage an outbreak once the virus enters the facility. Knight also contends he is at a greater risk of contracting COVID-19 given the lack of opportunity for social distancing at WCDF. Preliminarily, Knight admits he is unaware of known inmate cases of COVID-19 at WCDF, and he presents no evidence that he is at higher risk for severe illness should he contract the virus. Knight, at 31 years old, is outside the CDC's indicated high-risk age range, and does not provide evidence of any serious underlying medical conditions putting him at risk of severe illness.

It is undisputed that the CDC recommends avoiding crowds and social distancing to reduce the risk of transmission.[12] On March 29, President Trump extended social distancing guidelines, which recommend avoiding social gatherings of ten or more people through at least the end of April, perhaps longer.[13] As noted above, Nevada's Governor issued a directive for all Nevadans to stay at home and extending social distancing practices for the same time period.

WCDF is reportedly taking reasonable recommended precautions, including having medical staff screen inmates during intake for COVID-19 risk, isolating those deemed to be high risk, and promoting other recommended hygiene habits. (*See* ECF No. 30-1). WCDF is implementing CDC and WHO guidelines, purchasing COVID-19 test kits, communicating best practices for personal hygiene to prevent the spread, encouraging employees to stay home if they are ill, and developing plans to separate high-risk individuals who are more susceptible to COVID-19. (*See id.*) Further, in the event an inmate becomes too ill to be cared for within the detention center, the inmate will be transported to a local medical facility for treatment. (*Id.* at 10.) WCDF also changed

---

[12] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html (last visited Mar. 26, 2020) (setting forth steps to reduce the risk of transmission).

[13] *See* New York Times, TRUMP EXTENDS SOCIAL DISTANCING GUIDELINES THROUGH END OF APRIL, https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html, (last visited Apr. 3, 2020).

visitation policies to suspend social visits and minimize in-person legal visits.[14]  In order to allow WCDF inmates access to families during the pandemic, WCSO set up "virtual visitations" through the internet and provides free phone calls for all inmates. *Id.*  Even despite the recent news of WCSO employees testing positive for COVID-19, there remains no indication that any WCDF inmate has been affected.

Knight supports his argument by stating individuals who are not symptomatic or have unknowingly been exposed will bring the virus into the WCDF. (ECF No. 30 at 4.)  While it is true infected persons may not show symptoms until between two to fourteen days after exposure, and some percentage of infected persons may be asymptomatic or show very mild symptoms, that is also the case outside of WCDF.[15]  Knight further argues that COVID-19 testing is not available for WCDF inmates. (ECF No. 30 at. 12.)  Even if the facility does not have COVID-19 testing available, this is an ongoing problem that is not unique to prison and jail systems.[16]  Knight's reply brief points to Magistrate Judge Weksler's order in *United States v. Cox,* 2020 WL 1491180, at * 4, (D. Nev. Mar. 27, 2020), stating that "[g]iven the medical obstacles identified by major cities, it is doubtful that Southern Nevada Detention Center and the hospital at Pahrump will fare better than hospitals in New York or California." (ECF No. 37 at 2, n. 2.)  The court acknowledges the great difficulties encountered by local hospitals and medical centers in detention and correctional facilities during this pandemic.  However, those difficulties are faced around the world; the strain on healthcare resources exists nationwide, statewide, including Reno

---

[14]    *See* Washoe County Sheriff's Office, COVID-19 UPDATE, https://www.washoesheriff.com/resources/files/COVID-19%20Backup%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.pdf (last viewed Mar. 27, 2020).

[15]    *See,* CDC, SYMPTOMS OF CORONAVIRUS, https://www.cdc.gov/coronavirus/ 2019-ncov/symptoms-testing/symptoms.html, (last viewed Apr. 3, 2020); New York Times, INFECTED BUT FEELING FINE: THE UNWITTING CORONAVIRUS SPREADERS, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html, (last viewed Apr. 3, 2020).

[16]    *See, e.g.,* Robert Kuznia, et al, SEVERE SHORTAGE OF SWABS AND OTHER SUPPLIES HAMPER CORONAVIRUS TESTING, https://www.cnn.com/2020/03/18/ us/coronovirus-testing-supply-shortages-invs/index.html (last visited Mar. 26, 2020).

where Knight proposes to go if he is temporarily released from custody.[17]  The court also notes Judge Weksler denied Cox's motion seeking release. *Cox,* 2020 WL 1491180, at *7.

In sum, Knight presents no specific COVID-19 risk factors and his arguments are too speculative or generalized to favor release.  Knight cannot predict the extent to which COVID-19 cases might arise at WCDF any more than many Americans can predict how they might be exposed to the virus.  Knight also cannot predict how WCSO might respond to an outbreak any more accurately than many Americans can predict how their local hospitals might respond.  While inmates may not be able to fully adhere to optimal social distancing guidelines, these circumstances are generalized to all individuals in the prison system and are not unique to Knight.  WCDF staff and medical personnel have prepared for very likely possibility of an infected person entering the jail and instituted standard practices and procedures to screen, separate, or quarantine individuals as necessary in same manner as being done in the general Northern Nevada community.  The court therefore finds Knight's concerns about WCDF to be unsupported.  Thus, this factor weighs against release.

### 3.  *The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate the Defendant's Overall COVID-19 Risks*

The Bail Reform Act allows for temporary release only if the court determines such release is "necessary" for a compelling reason. 18 U.S.C. § 3142(i).  In the context of COVID-19, this means the proposed temporary release plan should be tailored to mitigate the defendant's overall COVID-19 risks, not exacerbate them. *Clark,* 2020 WL at 1446895, at *6.  Thus, the court evaluates the extent to which a defendant's proposed release plan mitigates or exacerbates the defendant's overall COVID-19 risk. *Id.*

---

[17]  *See, e.g.,* Nevada Dept. of Public Safety, COVID-19 PANDEMIC SITUATION REPORT, https://nvhealthresponse.nv.gov/wp-content/uploads/2020/03/3.25.20-Sit-Rep.pdf (last visited Mar. 26, 2020).

Here, Knight's proposed release plan includes residing with his significant other, Cristin Smith, in the Reno/Sparks area. (ECF No. 30 at 17.)  The Government objects to Knight's plan to reside with Ms. Smith because Ms. Smith is a potential witness in this case and was already proffered and rejected as a third-party custodian at Knight's detention hearing. (ECF No. 35 at 11.)  Knight's plan does not address all aspects of public health officials' recommendations and does not address other risk factors that would arise if Knight were released from custody. (ECF No. 30 at 17.)  Knight has not set forth a record establishing that, even if someone at WCDF were to contract COVID-19, WCSO is unprepared to contain the virus or care for those who may become infected. To the contrary, WCSO established a comprehensive plan to manage WCDF during the pandemic. (ECF No. 30-1.)  The record is void of information suggesting WCDF would be unable to render appropriate medical treatment to Knight if he became ill.  Thus, Knight's unexplained, conclusory allegations regarding WCDF's inability to manage the care of inmates during the pandemic does not rise to the level of justifying temporary release based on COVID-19 concerns.

Knight does not address the extent to which his risks could be exacerbated if he resides with Ms. Smith at an unspecified location in the Reno/Sparks area. (ECF No. 30 at 17.)  Knight proposes home confinement and location monitoring as conditions of release. (*Id.*)  However, Knight offers no evidence to explain how the proposed living situation mitigates the risk of infection.  For example, he does not explain who else has or will live in or frequent the home or identify any screening practice or concrete COVID-19 precautions taken there.  Knight therefore offers nothing more than mere speculation that home detention would be less risky than living in close quarters with others at WCDF, which at least has screening practices and other reasonable COVID-19 precautions in place.

Knight also does not address the risk of exposure while en route from WCDF to Ms. Smith's residence in an unspecified location in the Reno/Sparks area.  Knight does

not address, once there, how the limited capacity of the Reno/Sparks-area health care system will provide him with any different adequate treatment outside WCDF if Knight were to contract the virus.  In contrast, if Knight remains at WCDF, he has access to medical care should he become ill.  WCSO, as operator of WCDF, collaborates with the county and state health agencies and others to keep its employees and those in its care safe and healthy.  WCSO has ample motivation to prevent any outbreak at WCDF and, even if an outbreak occurs, to contain and manage it for the well-being of all involved.

On balance, the court is persuaded this factor weighs against temporary release because there is insufficient evidence presented and it is speculative to predict whether Knight is safer in terms of his overall COVID-19 risks at WCDF or temporarily released from custody to live with Ms. Smith, his significant other, at an unspecified location in the Reno/Sparks area.

### 4. *The Likelihood that Defendant's Proposed Release Plan Would Increase COVID-19 Risks to Others*

In considering temporary release under § 3142(i) based on circumstances related to COVID-19, it is also appropriate to consider the likelihood the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate conditions of release. *Clark,* 2020 WL at 1446895, at *7.  A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if the defendant is taken back into custody. *Id.*

In this case, these considerations do not support release.  The court originally detained Knight because he was a risk of flight and/or a danger to the community, as discussed above.  Given the § 3142(f) and (g) considerations discussed previously, the court believes Knight will likely violate any conditions of release the court may impose if

the court were to issue a temporary release order. Knight proposes home confinement and location monitoring as conditions of release. (ECF No. 30 at 17.)

As another court recently observed, "[w]hile the location monitoring that [defendant] proposed may offer useful information about where he is, it provides little useful information about what he is doing." *Martin,* 2020 WL 1274857, at *4. Here, Knight has been unable or unwilling to remain law-abiding for most of his adult life, and prior to his arrest in this case, already fled to Las Vegas in an attempt to avoid arrest. The court has no reason to believe he would suddenly become compliant now.

Furthermore, supervising a high-risk offender out in the community will place pretrial services officers at a heightened risk of contracting the virus. "[L]ocation monitoring is not a limitless resource, nor is its installation and monitoring by the United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given current recommendations regarding implementation of social distancing." *Id.* Knight seeks release at a time when Pretrial Services Officers across the country are teleworking in shifts and seeking to minimize physical contact with defendants to reduce the risk of viral transmissions. The court finds this is a significant disadvantage when seeking to monitor defendants requiring intense supervision, as Knight would require.

Finally, Knight proposes being released to home confinement with Ms. Smith. Knight provides no information relating to the age and/or underlying health conditions of Ms. Smith, and therefore, the court does not have sufficient information to determine whether such a placement would go against current CDC guidance recommending limiting in-person contact individuals with high-risk health conditions. Therefore, this factor weighs against temporary release. In conclusion, Knight has not met his burden of demonstrating that the health risks posed by COVID-19 are a compelling reason justifying temporary release under § 3142(i).

///

### C.    Necessary for Preparation of Defense

Knight also argues temporary release is necessary for the preparation of his defense. (ECF Nos. 30, 37.)  His attorney states it is "unwise" to visit a client at WCDF during the COVID-19 pandemic because counsel may unknowingly expose Knight to the virus. (ECF No. 30 at 12.)  Knight additionally asserts there are limited means for contact visits at WCDF. (*Id.*)

The Government argues Knight has not shown in-person visits are necessary to prepare his defense, and that release would not necessarily improve his access to his attorney. (ECF No. 35.)  The Government asserts other limitations are not impeding Knight's ability to meet and confer with attorneys, defense investigators and experts through WCDF's video conference calls. (*Id.* at 11.)

Courts considering whether pretrial release is necessary for a person's defense under § 3142(i) consider: "(1) the time and opportunity the defendant has to prepare for the trial and participate in his defense; (2) the complexity of the case and volume of information; and (3) expense and inconvenience associated with preparing while incarcerated." *Cecerle,* 2014 WL 31674, at *4.  However, these typical considerations are not necessarily relevant to claims made by defendants seeking release due to COVID-19 concerns.

WCDF has limited in-person visitation at the jail and provided for teleconferencing and telephone communication with legal representatives and visitors during the COVID-19 pandemic.  Knight will still have access to his attorney while detained during the pandemic through these means.  Even outside WCDF, while law firms are deemed "essential businesses" in Nevada and may still operate, they are supposed to follow strict social distancing guidelines.  Attorneys and clients outside of the correctional/detention setting are also utilizing telephone and videoconferencing as their primary modes of communication.    Knight has a constitutional right to unmonitored calls or

videoconferencing with his counsel from WCDF, and he provides no evidence showing WCDF has violated that right.

Knight does not present a declaration from counsel indicating the frequency of attorney-client visits before the pandemic or stating why counsel cannot adequately prepare for trial utilizing telephonic and videoconferencing communications methods. While counsel may believe "effective representation requires in-person communication and consistent face-to-face contact with clients" and video conferencing "may hamper the ability to develop a relationship conducive to effective representation," the court reiterates the fact we are currently living in unprecedented times, with even the court system having to change and adapt with the current limitations. Even if Knight were to be temporarily released to live in an unspecified location in the Reno/Sparks area, given the current shelter-in-place directive issued by Governor Sisolak, it is unlikely Knight would be able to have in person meetings with his counsel or have access to any type of videoconferencing. Therefore, Knight's ability to communicate with counsel during the pandemic may be greater while he is housed at WCDF.

The court does not find Knight's temporary release is necessary for the preparation of his defense. The court is sympathetic to the circumstances surrounding Knight's ability to communicate with counsel during the pandemic while housed at WCDF, but to the extent these limitations exist while he is detained, they will almost certainly exist if he is released. Therefore, this factor also weighs against temporary release. Thus, considering all the facts before the court at this time, the court does not find Knight's temporary release is necessary to prepare his defense.

### D.    Due Process Clause Argument

Knight advances another argument based on constitutional protections of pretrial detainees under the Due Process Clause of the Fifth Amendment. (ECF No. 30.) Knight argues that under the Fifth Amendment, pretrial detainees may not be punished. (*Id.* at 13.) Knight asserts that if the pretrial detainee's conditions of confinement are not

reasonably related to a legitimate goal (i.e., if they are arbitrary or purposeless), then the court may infer that the purpose of the government action is punishment, which is prohibited. (*Id.* at 13-14.) Knight argues the COVID-19 pandemic presents a significant risk of harm to him that outweighs the government's interest in confinement. (*Id.* at 15.) Knight notes that pretrial detainees have an Eighth Amendment right to adequate medical care. (*Id.* at 14.)

The Government opposes Knight's motion for temporary release but does not specifically address the Fifth Amendment argument. (*See* ECF No. 35.)

In evaluating whether a condition of pretrial detainment violates the Fifth Amendment, the question is whether the condition amounts to punishment. *Bell,* 441 U.S. at 535. The United States Supreme Court stated,

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539; *see also Demery v. Arpaio,* 378 F.3d 1020, 1028 (9th Cir. 2004) (applying same rule). Thus, the question before this court is whether Knight's detention is reasonably related to a legitimate government objective.

The court finds Knight's detention is reasonably related to the legitimate government interests of protecting the community and ensuring his appearance at trial. At Knight's detention hearing, Judge Foley detained him finding that he posed a danger to the community and a flight risk and that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community or reasonably assure Knight's appearance as required. (ECF No. 12 at 2.) Knight does not argue that any of the § 3142(g) factors have changed. Accordingly, the court finds Knight's detention remains reasonably related to the above stated legitimate government interests.

The recent COVID-19 pandemic does not change the analysis for Knight under the Fifth Amendment's Due Process Clause.  Knight's argument, that the COVID-19 pandemic presents a significant risk of harm that outweighs the government's interest in confinement, improperly suggests a balancing test applies. (*See* ECF No. 30.)  As previously discussed, the Fifth Amendment's Due Process Clause simply asks whether the pretrial detainment is reasonably related to a legitimate government interest. *Bell,* 441 U.S. at 539.  Here, it is.

Finally, Knight notes that pretrial detainees have a legal right to adequate medical care under the Eighth Amendment. (ECF No. 30 at 14.)  Knight does not provide much analysis on this point or explain how this right justifies his release in this case.  Knight argues "there is no greater necessity than keeping a defendant alive" and points to his argument that detention centers are particularly susceptible to the spread of communicable diseases despite protective measures. (*Id.* at 14-15.)  However, Knight's statement is conclusory and unsupported by any evidence as to how WCDF has not provided adequate medical care to Knight or what his current medical needs are.  Therefore, the court will not grant Knight temporary release on this basis.

## IV.    CONCLUSION

On balance, Knight has not set forth new information to override or counterbalance the court's concerns identified when making the decision to detain pending trial. Nor has Knight met his burden of demonstrating a compelling reason justifying temporary release, any type of Fifth Amendment Due Process consideration, nor that the circumstances of the COVID-19 pandemic necessitate temporary release to prepare his defense.  To the contrary, it appears if Knight were released, he would simply be trading one set of problems for another.  Additionally, Knight's proposed release plan would place pretrial services officers at risk in supervising him, and when the temporary release inevitably ends, other law enforcement officers and the facility would be placed at risk in re-

apprehending Knight after having ample opportunity for contamination. Therefore, Knight has not established a compelling reason that temporary release is necessary.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Temporary Release (ECF No. 30) is **DENIED**.

**IT IS SO ORDERED.**

**DATED**: April 6, 2020.

_____
UNITED STATES MAGISTRATE JUDGE