UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br>     v.<br>EDWARD MONET KNIGHT,<br><br>                      Defendant. | Case No. 3:19-cr-00038-MMD-CLB<br><br>ORDER |

**I.     SUMMARY**

On August 1, 2019, a grand jury indicted Defendant Edward Monet Knight on two counts of Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, and two counts of Use of a Firearm During and in Relation to a Crime of Violence, for two armed robberies of local businesses. (ECF No. 14.) On October 10, 2020, the Court partially granted Knight's motion for access to jury selection records and materials. (ECF No. 68.) Trial began on March 8, 2021. (ECF No. 141.) Before the Court is Knight's motion to dismiss his indictment due to an unconstitutionally invalid grand jury, filed prior to trial.[1] (ECF No. 114 (the "Motion").) In a minute order, the Court denied the Motion, stated a written order more fully explaining its reasoning would follow, and ordered trial to proceed as scheduled. (ECF No. 126.) As further explained below, the Court now provides a more fulsome explanation as to why it denied the Motion—because Knight failed to demonstrate that his proffered underrepresentation of certain groups in the grand jury venire was due to systematic exclusion of a group in the jury-selection process and failed

---

[1] The government opposes the Motion. (ECF No. 121.) Knight filed a reply. (ECF No. 124.)

to demonstrate the discriminatory intent required to show a violation of his equal protection rights.

## II. DISCUSSION

Knight argues that the District of Nevada's current Jury Selection Plan systematically underrepresents Black, male, Hispanic or Latino, and Native American or Native Alaskan eligible jurors in violation of the Fifth Amendment's equal protection clause, the Sixth Amendment's fair cross-section requirement, and the Jury Selection and Service Act ("JSSA"), necessitating dismissal of his indictment. (ECF No. 114.) The Court addresses each argument in detail below.

### A. Fifth Amendment Equal Protection Clause

Knight first argues that the Jury Selection Plan violates his rights under the Fifth Amendment's equal protection clause because Black and male jurors are systematically underrepresented in the venire used to select grand jurors in the unofficial Northern Division of the District of Nevada. (*Id.* at 6.)

To make out a prima facie challenge to the Court's Jury Selection Plan under the Fifth Amendment's equal protection clause, Knight must establish: (1) he is a member of a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied[;]" (2) the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors over a significant period of time; and (3) discriminatory intent. *Castaneda v. Partida*, 430 U.S. 482, 493 (1977). When analyzing the degree of underrepresentation, the Ninth Circuit Court of Appeals described a range of statistical models used by courts, found it "appropriate to abandon the absolute disparity approach" as the exclusive method used by the Ninth Circuit, and "decline[d] to confine district courts to a particular analytical method," but rather recognized that "the appropriate test or tests to employ will largely depend on the particular circumstances of each case." *United States. v. Hernandez-Estrada,* 749 F.3d 1154, 1164 (9th Cir. 2014).

///

Knight first argues that he is a member of two distinct groups—Black and male—thereby satisfying the first prong. (ECF No. 114 at 7.) As to the second prong—degree of underrepresentation—Knight argues that the degree of underrepresentation amounts to an equal protection violation under a comparative disparity analysis, supported by a standard deviation analysis.[2] (*Id.* at 7-9.) The government responds that Knight fails to establish unfair underrepresentation under either the absolute disparity test or comparative disparity test and argues that Knight's proffered standard deviation analysis is unhelpful, and further argues that, even accepting Knight's proffered analysis as accurate and applicable, it nonetheless generates results showing disparity merely within the range other courts have deemed acceptable. (ECF No. 121 at 13, 24.) As to the third prong, Knight contends the Court must presume the Jury Selection Plan was adopted with discriminatory intent because his proffered standard deviation analysis shows that his proffered underrepresentation is very unlikely a product of chance. (ECF No. 114 at 9-10 (citing *Castaneda*, 430 U.S. at 494 n.13).) Knight supports his argument with expert testimony from Jeffrey Martin, who concludes that the underrepresentation is "not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents." (*Id.* at 10; ECF No. 114-1 at 7-8.)

To start, there is no dispute that as a Black male, Knight is a member of a distinct group under an equal protection analysis. *See United States v. Cannady,* 54 F.3d 544, 547 (9th Cir. 1995); *see also Craig v. Boren,* 429 U.S. 190, 197 (1976).

But the Court ultimately concludes Knight fails to demonstrate a violation of his rights under the Fifth Amendment's equal protection clause because Knight has not demonstrated discriminatory intent under prong three. As noted, Knight's only evidence of discriminatory intent is Mr. Martin's conclusion, based on his standard deviation

---

[2]Specifically, under Mr. Martin's comparative disparity analysis, Black individuals are 53.34% underrepresented in the jury pool, and males are underrepresented by 4.27%. (*Id.* at 8-9.) Further, Knight argues that Black and male jurors are underrepresented by more than three standard deviations. (*Id.*)

3

analysis, that the underrepresentation he found is very unlikely explicable by chance. (ECF No. 114-1 at 7-9.) Mr. Martin explains that this conclusion is predicated on a variance from expected of more than three standard deviations. (*Id.* at 8-9.) While it is true that "if a disparity is sufficiently large, then it is unlikely that is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process," the Court finds that a variance from expected of three to four standard deviations is not "sufficiently large" so as to create a conclusive presumption like Knight argues. *Castaneda,* 430 U.S. at 494 n. 13.

While the Court was only able to locate limited caselaw on this point, courts have found that underrepresentation of the size proffered here is not enough to demonstrate underrepresentation under prong two.[3] By extension, the underrepresentation proffered here cannot be "sufficiently large" enough to then presume intent under prong three. This

---

[3]In *United States v. Smith,* 457 F.Supp.3d 734, 742 (D. Alaska, May 5, 2020), the court found that "the comparative disparity rates ranging from 29.14% to 57.27% fall within the level of comparative disparity that other circuit courts have held to be permissible . . . .For example, comparative disparities of 54.49%, 58.39%, and 59.84% have been found permissible by other circuits. Moreover, the Ninth Circuit, in dicta, has permitted a comparative disparity of 52.9%." (citing *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268-69 (3d Cir. 2019); *United States v. Chanthadara*, 230 F.3d 1237, 1256-57 (10th Cir. 2000); *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998); *United States v. Sanchez-Lopez*, 879 F.2d 541, 548 (9th Cir. 1989)). More importantly, in *Smith*, the court found that a standard deviation of 13 to 16 was insufficient. There the defendant argued, supported by expert testimony from the same Mr. Martin, that a disparity that varied from expected of between 13 and 16 standard deviations, demonstrated a "constitutionally significant underrepresentation." 457 F.Supp.3d at 741. But, the court found that "given that disparities calculated under both the absolute disparity method and comparative disparity method fall within the ranges upheld by the Ninth Circuit, the defense has not demonstrated that this statistical deviation, to the extent it was caused by the district's use of the wrong formula, is of legal significance." *Id.* at 743 (citing *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980) (declining to focus on standard deviation disparity when the absolute disparities demonstrated by the defendant did not make out a constitutional violation); *United States v. Orange*, 447 F.3d 792, 799 (10th Cir. 2006) (declining to consider "other statistical measures ... when the existing measures, absolute and comparative disparity, fail to establish a prima facie case under existing law.")).

4

renders Mr. Martin's testimony unpersuasive. And without any affirmative evidence of discriminatory intent on this district's part when it adopted the operative Jury Selection Plan, the Court finds Knight's argument that the deviation here is "so severe that . . . the court must presume 'racial or other class-related factors entered into the selection process'" even more unpersuasive. (ECF No. 114 at 10 (citing *Casteneda*, 430 U.S. at 494 n.13).) The Court will deny Knight's Motion to the extent predicated on his Fifth Amendment challenge.

### B. Sixth Amendment Fair Cross-Section

Knight next argues that the composition of his grand jury venire violates the Sixth Amendment's fair cross-section requirement because certain minority groups are underrepresented in the venire. (ECF No. 114 at 10-14.)

To establish a prima facie fair cross-section violation, the defendant must show: (1) the allegedly excluded group is "distinctive" in the community; (2) representation of the distinctive group in the venire from which juries are selected is not fair and reasonable as compared to the number of such persons in the community; and (3) the underrepresentation is the result of systematic exclusion of the distinctive group in the jury-selection process. *See Duren v. Missouri,* 439 U.S. 357, 364 (1979). After the defendant establishes a prima facie case, the burden shifts to the government to demonstrate "a significant state interest . . . advanced by those aspects of the jury-selection process." *Id.* at 367-68.

There is again no dispute as to the first prong—that Knight's allegedly excluded groups of Black, male, American Indian, Native Alaskan, and Hispanic or Latino are "distinctive" in the community. As to the second prong, Knight again uses a comparative disparity analysis supported by a standard deviation analysis to argue underrepresentation. (ECF No. 114 at 12.) As with Knight's Fifth Amendment challenge, the government argues the analytical measures introduced by Knight are entitled to little weight. (ECF No. 121 at 6-15.)

///

As to Knight's Sixth Amendment challenge, the Court again finds that even assuming he has demonstrated underrepresentation at step two, Knight's showing on the third prong—that the underrepresentation is the result of systematic exclusion of distinctive groups—is insufficient. In arguing the third prong, Knight proffers three specific examples to explain how the Jury Selection Plan leads to systematic exclusion. As further explained below, the Court is unpersuaded that these three examples show systematic exclusion.

First, Knight argues that because the Jury Selection Plan draws from some counties at a higher rate than others, the "skewed weighting impacts the underlying demographics of the qualified jury wheel." (ECF No. 114 at 13.) But Knight's conclusion is unsupported by any evidence tending to show systematic exclusion. Knight more broadly argues that because counties have different demographics, the only way to ensure no group is unfairly excluded is to equalize the weight of all counties. (ECF No. 124 at 18.) But Knight fails to explain in detail, for example, how drawing more heavily from Douglas County as opposed to Pershing County, evidences systematic exclusion of any distinctive group.

Next, Knight argues that his proffered underrepresentation is the result of systematic exclusion because the Jury Selection Plan draws only from active voters—as opposed to registered voters. (ECF No. 114 at 13.) But again, and as the government notes, Knight fails to describe the impact this has on any distinctive group he claims is underrepresented. For example, Knight fails to provide any demographic information of inactive voters. Without any evidence to rely on, the Court simply cannot conclude that drawing only from active voters leads to the systematic exclusion of certain groups.

Finally, Knight argues that the Jury Selection Plan systematically excludes the distinctive groups in question by requiring the Court to refresh the qualified jury wheel only every two years instead of every year. (*Id.* at 13-14.) While Knight provides more evidence to support this assertion—evidence that African Americans move at a higher annual rate of 28.53% than other groups, and those ages 18, 19, or 20 years old are more

diverse—the Court is again unpersuaded. Rather, the Court finds that Knight's proffered underrepresentation of the distinctive groups is not "inherent in the particular jury-selection process" used to select the grand jury. In other words, Knight fails to demonstrate how these demographic trends are significant enough to require the conclusion that the Court's Jury Selection Plan systematically excludes certain groups. Further, while the Court agrees with Knight that the JSSA is a floor and not a ceiling, there is nonetheless no dispute that the Court has satisfied the JSSA's requirements as to the frequency of refreshing the jury pool. The JSSA requires the jury pool be refreshed every four years, while the District of Nevada's Jury Selection Plan requires the wheel be refreshed every two years. In sum, Knight has failed to satisfy the third *Duren* prong, and his Motion is therefore denied to the extent predicated on a Sixth Amendment violation.

**C. JSSA**

Knight finally argues that the Jury Selection Plan substantially violates the JSSA, also necessitating dismissal of his indictment. (ECF No. 114 at 15 (citing *United States. v. Nelson,* 718 F.2d 315, 318 (9th Cir. 1983)).) Specifically, Knight argues that the plan violates the JSSA by drawing from active registered voters,[4] and not selecting from a fair cross-section of the community.[5] The government counters that Knight's JSSA claim is untimely, and then responds to Knight's arguments on their merits. (ECF No. 121 at 26-28.)

///

---

[4]Knight specifically points to language in the JSSA that requires the selection plan to "specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division" and if not, the "plan shall . . . prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights." (*Id.* at 14 (citing 28 U.S.C. § 1863(b)(2)).)

[5]The JSSA specifies that defendants have "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. A fair cross-section analysis under the JSSA is the same as a Sixth Amendment fair cross-section analysis. *See Hernandez-Estrada,* 749 F.3d at 1158. Knight raises substantially the same arguments in his JSSA challenge as those discussed above as to Knight's the Sixth Amendment challenge.

As to timeliness, Section 1867(a) requires:

> …in criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a).

While the Court agrees with the government that Knight's motion is untimely under a plain reading of the statute,[6] the Court also agrees with Knight that strictly applying the requirements of Section 1867(a) to grand juries would lead to an absurd result—because voir dire of the grand jury "will *always* be the earlier condition satisfied because the voir dire process occurs when the grand jury is first convened and selected." (ECF No. 124 at 16 (emphasis in original).) Thus, the Court declines to deny the JSSA portion of Knight's Motion solely because he did not file it before voir dire examination of the grand jury that later indicted him began.

But alternatively, assuming the Court were to ignore the plain language of the statute,[7] Knight has still shown insufficient evidence that his Motion is timely. Knight argues that the seven-day requirement is not based on when he had access to underlying demographic data, but rather the time when his expert finished reviewing and analyzing the demographic data. (ECF No. 124 at 16-17.) That cannot be correct—and indeed is even more absurd than using the grand jury voir dire as the trigger for timeliness— because the statute requires diligence. Moreover, and as the government notes, Knight

---

[6]A plain reading of Section 1867(a) requires a motion be filed before voir dire begins, or within seven days after discovery, "whichever is earlier." 28 U.S.C. § 1867(a). Thus, here, voir dire is "earlier" under the statute.

[7]The Court understands that the statute requires a motion be brought at whichever event—prior to voir dire or within seven days of discovering the violation—comes first, but given the above discussion regarding the absurdity of bringing a claim prior to grand jury voir dire, the Court will assume for the sake of argument that the "could have discovered, by the exercise of diligence" trigger applies here.

waited 11 months before even seeking the grand jury demographic data here, and then waited even longer before filing this Motion. Knight does not persuasively explain the reasons for that long delay. Thus, the Motion is untimely under the diligence standard provided in the statute.

Other courts have interpreted Section 1867(a) as mandating the motion be brought within seven days of indictment. *See United States v. Dean*, 487 F.3d 840, 849 (11th Cir. 2007); *United States v. Saipov*, Case No. 17-CR-722, 2020 WL 915808, at *6-*7 (S.D.N.Y. Feb. 26, 2020); *United States v. Nunnally*, Case No. 5:05-cr-00045-RS-GRJ, 2011 WL 643443, at *2 (N.D. Fla. 2011); *United States v. Buczek*, Case No. 08-CR-54S, 2009 WL 2230808, at *1 (W.D.N.Y. 2009). But even under that interpretation—which the Court does not adopt—Knight's Motion would be untimely. Knight was indicted on August 1, 2019 (ECF No. 14), and the Motion was filed on February 16, 2021 (ECF No. 114). That is more than seven days after indictment.

In addition to being untimely, Knight's JSSA argument is unpersuasive on its own merits. In order for a Court to dismiss an indictment based on a JSSA challenge, a defendant must demonstrate that their argued violation of the JSSA constitutes a "substantial failure to comply." *Nelson,* 718 F.2d at 318 (quoting 28 U.S.C. § 1867(a)). A violation is insubstantial when it does not "frustrate the Act's goals." *Id.* The analysis of a JSSA fair cross-section challenge is the same as a Sixth Amendment fair cross-section analysis. *See Hernandez-Estrada*, 749 F.3d at 1158.

Because a JSSA fair cross-section challenge requires the same analysis as a Sixth Amendment fair cross-section challenge, the Court refers to its analysis above, rejecting Knight's Sixth Amendment fair cross-section challenge, and finds that for those reasons, he has similarly failed to demonstrate a substantial JSSA violation. Moreover, as to the second element of Knight's JSSA challenge regarding the use of active voter registration lists, the Court again refers to its analysis above, and similarly concludes that as there, Knight has failed to demonstrate how exclusion of inactive voters systematically excludes

underrepresented groups so as to amount to a substantial JSSA violation. In sum, the Court also denies Knight's Motion to the extent predicated on purported JSSA violations.

### III. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Knight's motion to dismiss his indictment due to an unconstitutionally invalid grand jury (ECF No. 114) is denied.

DATED THIS 11th Day of March 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE